Filed 9/4/13  In re Diego H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re DIEGO H., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D063500 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ13209C) |
| v. | |
| R.H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Patrice Plattner-Grainger and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Patricia K. Saucier, under appointment by the Court of Appeal, for Minor.

R.H. appeals an order under Welfare and Institutions Code[1] section 366.26 selecting adoption as the permanent plan for his son Diego H. and terminating his parental rights. He also appeals the court's denial of his requests in a petition under section 388 for reunification services, placement of Diego with his mother, and a finding that efforts by the San Diego County Health and Human Services Agency (the Agency) to locate him were inadequate. R.H. contends (1) the Agency's failure to conduct a diligent search for him to advise him of his rights violated his right to due process; (2) there is insufficient evidence to support the court's finding that Diego is adoptable; and (3) the court's termination of his parental rights without a finding of parental unfitness violated his right to due process. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2010, the Agency filed a petition on behalf of two-year-old Diego under section 300, subdivision (b), alleging he was at substantial risk of physical harm or illness due to his mother's inability to supervise or protect him and provide regular care for him due to substance abuse.[2] The petition listed both R.H. and Robert O. as alleged fathers and stated that R.H.'s address was unknown. The petition alleged the mother used amphetamine/methamphetamine to excess and Robert used heroin to excess. During a probation search of the maternal grandmother's home, where Robert and the mother were staying, police found drugs and drug paraphernalia in areas that were accessible to Diego. The mother and Robert were both

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     The mother's name is Reyna P. However, both parties in their briefs refer to her as Joanne L., due either to inadvertence or some other reason not revealed by the record.

2

arrested and incarcerated on drug charges, and Diego was removed from the maternal grandmother's home and taken into protective custody.

The Agency's detention report stated that the mother identified R.H. as Diego's father and he was identified as the father on Diego's birth certificate. The mother did not know R.H.'s whereabouts, but believed he was somewhere in Tijuana, Mexico. Robert thought he might be Diego's father and wanted a paternity test to establish Diego's paternity.

The mother admitted to using methamphetamine for 11 years. She had previously lost custody of five older children to guardianship or adoption, including a child she relinquished for adoption at birth. She told the social worker that after having a brief affair with Robert in November of 2006, she started a relationship with R.H. in Mexico and became pregnant. After Diego was born, the mother left him with R.H. and the paternal grandmother in Tijuana. She was later arrested and incarcerated for transporting marijuana. While she was incarcerated, the maternal grandmother went to Tijuana and "took" Diego from R.H. and returned with him to the United States.

In its jurisdiction/disposition report, the Agency stated that Diego had been detained in a confidential foster home placement. The Agency initiated search efforts to find R.H. on August 4, 2010, and results were pending. A paternity test was done on Robert to determine if he was Diego's father, although the mother did not believe he was the father because she was in Tijuana with R.H. when she became pregnant.

At the jurisdiction/disposition hearing, the court entered a judgment of nonpaternity as to Robert because the paternity test results indicated he was not Diego's biological father. The court found that reasonable efforts had been made to locate and notify R.H. of the proceedings

3

and that no one had come forward to request presumed or biological father status. The court sustained the Agency's petition, declared Diego a dependent of the court, and ordered him removed from the mother's custody and placed in a licensed foster home.

A status review report for the six-month review hearing stated that a parent search for R.H. was completed on October 18, 2010, with no results. A social worker had contacted R.H.'s mother, who lived in Tijuana. She told the social worker that R.H. was in a Tijuana jail and would be incarcerated for another year or two. She had not seen R.H. in over a year and no one she knew had visited him in jail. She had not attempted to visit him because she was upset with him about his behavior and drug use. The social worker contacted La Mesa Penitenciaria, a prison in Tijuana, and was told that R.H. had been released in 2006.

The mother was incarcerated with an expected release date of April 1, 2011, and was participating in her services. Diego remained in confidential licensed foster care and was stable. At the six-month review hearing, the court ordered that Diego's foster placement be continued and the Agency continue to provide the mother services. The court again noted that no one had come forward to request presumed or biological father status.

The Agency's status review report for the 12-month review hearing recommended that reunification services be terminated and the matter be set for a section 366.26 hearing. The mother was released from prison on April 1, 2011, but was arrested and incarcerated several times after that date for possession of drugs and drug paraphernalia. She was on probation and had entered a residential treatment program. Diego was thriving in his foster home and was doing well in preschool. The Agency had submitted a new request through its international liaison office (liaison office) for the Baja California State Attorney General's office to locate

4

R.H. and results were pending. At the 12-month review hearing held on November 18, 2011, the court found the mother was making substantial progress with her case plan and there was a substantial probability that Diego would be returned to her custody by the 18-month date. The court continued Diego's placement in foster care and set an 18-month review hearing.

In its status review report for the 18-month hearing, the Agency again recommended that reunification services be terminated and the matter be set for a hearing under section 366.26. Although Diego's behavior had deteriorated for a period of time and his caregiver at one point had given notice for his removal, his behavior had improved and the caregiver no longer wanted him removed. The Agency reported Diego currently was on track developmentally and was generally very well behaved and well adjusted in his foster home.

The mother said she wanted to reunify with Diego, but she had not participated in services beyond visits with Diego since leaving her residential treatment program and had not progressed to unsupervised visits. She had not responded to the social worker's telephone calls and visits to her home to inquire about her current plans and perception of what she needed to do to gain custody of Diego. At the 18-month review hearing, the court terminated services to the mother and set a hearing under section 366.26.

In an assessment report prepared for the section 366.26 hearing, the Agency reported that R.H. was located on May 3, 2012, in Tijuana and served with notice of the hearing. He had not visited Diego and did not have a parental relationship with him. The mother could not be located and was served with notice through her attorney.

Diego was in good health and had no known medical problems. He was developing normally and his social skills were improving. He was a happy child most of the time. His

5

caregiver had planned to adopt Diego, but changed her mind during a period when he was acting out aggressively at preschool. Although Diego's behavior had improved and she was willing to keep him as a foster child, the caregiver had decided to pursue educational interests and did not feel that it was an appropriate time to adopt Diego. However, the Agency reported there were 65 families with approved adoption home studies that had requested a child matching Diego's description. The Agency recommended adoption as Diego's permanent plan.

On June 14, 2012, the court appointed counsel for R.H. and ordered that counsel be provided a copy of the case file. In an addendum report filed on July 24, 2012, the Agency reported that R.H. told Martha Sanchez, a staff member of the liaison office, that Diego had lived with him and the paternal grandmother for the first year and nine months of his life and that he (R.H.) had a 13-year-old son who was Diego's half brother. In a paternity questionnaire, R.H. stated the mother told him Diego was his child when she was two months pregnant.

On August 2, 2012, R.H. filed a petition under section 388 requesting that the court change its September 13, 2010, jurisdiction/disposition order by finding he was Diego's presumed father; finding the Agency had not made adequate efforts to locate him; vacating the prior dispositional findings; providing him six months of reunification services; and placing Diego with the paternal grandmother. R.H. alleged the requested changes would be better for Diego because his current caregiver was not willing to adopt him and no specific family had been identified that was. In addition, Diego had spent the first year and a half of his life with R.H. and the paternal grandmother and there was a half sibling in the paternal grandmother's home.

At a hearing on August 2, 2012, the court found that R.H. was Diego's presumed father. The court set the remainder of R.H.'s section 388 petition for a "further initial hearing on [August 15, 2012]." The court ordered a home evaluation on the paternal grandmother's home for possible placement of Diego with the paternal grandmother or R.H. in her home.

In an addendum report filed on August 15, 2012, the social worker stated that R.H. had essentially abandoned Diego. R.H. knew the maternal grandmother was taking Diego back to California, and the social worker thought it was "not only odd but negligent" for R.H. not to have asked for the address where Diego would reside or a telephone number he could call to maintain contact with Diego. The social worker noted R.H. had a criminal history and that he "gave his child away" and had not attempted to maintain contact with or locate Diego at any time, including the preceding six months after his release from prison.[3] Neither R.H. nor the paternal grandmother ever contacted the Agency to find out where Diego was or request placement with them until R.H.'s appointed counsel recently contacted him.

The social worker noted that Diego, who spoke English only, would have an extremely difficult time adjusting to people he no longer knew who did not speak the same language he spoke. He was five years old and had not seen R.H. since he was two years old. The social worker stated that Diego was "already struggling to learn the things that he needs to know to be successful in school[,] and he will likely suffer a huge set back if he has to go to Mexico and be in a home and school that speaks a language that is completely foreign to him."

_____

[3]     R.H. told a staff member of the liaison office that he was in prison for three years and was released in February 2012.

At the hearing on August 15, 2012, the court found that R.H. had carried his initial burden on his section 388 petition. The court granted R.H. an evidentiary hearing on the petition to be held prior to the contested section 366.26 hearing.

In an addendum report filed on October 1, 2012, the social worker provided additional information from a conversation with the maternal grandmother. The maternal grandmother said R.H. had her phone number but never called. The paternal grandmother had called her twice during the first two weeks after she brought Diego back from Mexico, and she called the paternal grandmother two or three times every other week for about a month and a half and then stopped. Diego was covered in scabies when the maternal grandmother got him and had been "very neglected."

The social worker reported that Diego's current caregivers had decided that they wanted to adopt him and were applying to do so. Diego had been in their home for over two years and was a part of their family and everyone in the family loved him. The foster mother had completed her schooling and an externship and was working as a pharmacy technician. Diego had bonded with his caregivers and their children and their extended family.

An addendum report filed on January 24, 2013, addressed a favorable home study performed on R.H. by the Mexican agency Desarollo Integral de la Familia (DIF). Although the Agency had requested a home study of both R.H. and the paternal grandmother, liaison office staff member Sanchez said they did not ask DIF to do a home study of the grandmother because it was not requested on the referral. DIF "only checked the house, income and a few other things, but did not interview the father or grandmother about the time they spent with Diego or any of the other questions [the Agency] had."

8

The Agency contacted R.H. by telephone on January 16, 2013, and questioned him about his home environment. R.H. said the paternal grandmother wanted to keep Diego and would adopt him if he could not be placed with R.H. R.H.'s 14-year-old son lived in the house with R.H. and the grandmother and there was room for Diego. The grandmother's house had two rooms—a kitchen and another room "they all share." R.H. worked six days a week and would spend his day off with Diego. He was unaware that Diego spoke only English and conceded it would be a problem for Diego if he did not speak or understand Spanish. He was not sure what he would do about that or how he would handle it. He was also unaware that Diego had been with the same foster family for about two years and was doing very well at home and at school, and the family wanted to adopt him. However, he still wanted Diego to live with him and the paternal grandmother because "he is blood."

The Agency's addendum report filed on February 8, 2013, noted that although R.H. stated the paternal grandmother was willing to care for Diego, she had not personally requested that he be placed with her. R.H. stated he had been incarcerated from May or June 2009 until February 2012 and was sentenced for robbery. After he was released, he did not make any efforts to search for Diego. The social worker's assessment was that placing Diego in the care of either R.H. or the paternal grandmother would likely be very traumatic for him and would not be in his best interests, and any future benefit from a relationship with R.H. did not outweigh the benefits of adoption.

On February 8, 2013, the court held the contested hearing on R.H.'s section 388 petition and the contested section 366.26 hearing and admitted all of the Agency's reports into evidence. The court found that the Agency's search efforts for R.H. were reasonable and

9

denied R.H.'s section 388 petition. Proceeding to the section 366.26 hearing, the court found by clear and convincing evidence that it was likely Diego would be adopted and adoption was in his best interests. The court terminated parental rights, continued Diego's placement in foster care, and referred him to the Agency for adoptive placement. Both parents appealed. This court dismissed the mother's appeal on June 4, 2013, because she raised no claim of error or other defect.

DISCUSSION

I. *Denial of the Section 388 Petition*

R.H. contends the court's denial of his section 388 petition was an abuse of discretion because the Agency failed to use reasonable efforts to locate him, and its lack of diligence in searching for him violated his right to due process.

"Section 388 allows a parent or other person with an interest in a dependent child to petition the juvenile court to change, modify, or set aside any previous order. (§ 388, subd. (a).) 'Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' [Citations.] The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances and (2) that the proposed modification would be in the best interests of the child. [Citations.] That is, '[i]t is not enough for [the petitioner] to show just a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615, italics omitted.) "In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire factual and procedural history of the case." (*Id*. at

10

p. 616.)  We review a juvenile court's denial of a section 388 petition for abuse of discretion. We will not disturb the juvenile court's decision "unless that court has exceeded the limits of judicial discretion by making an arbitrary, capricious, or patently absurd determination."  (*In re E.S.* (2011) 196 Cal.App.4th 1329, 1335.)

A section 388 petition "is a proper vehicle to raise a due process challenge based on lack of notice."  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189 (*Justice P.*).)  "Parents are entitled to due process notice of juvenile court proceedings affecting the care and custody of their children, and the absence of due process notice to a parent is a 'fatal defect' in the juvenile court's jurisdiction.  [Citation.]  Due process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'  [Citation.]  The means employed to give a party notice for due process purposes must be such as one, desirous of actually informing the party, might reasonably adopt to accomplish it.  [Citation.]  [¶] If the whereabouts of a parent are unknown, the issue becomes whether due diligence was used to locate the parent.  [Citation.] The term 'reasonable or due diligence' ' "denotes a thorough, systematic investigation and inquiry conducted in good faith." '  [Citation.]  Due process notice requirements are deemed satisfied where a parent cannot be located despite a reasonable search effort and the failure to give actual notice will not render the proceedings invalid."  (*In re Claudia S.* (2005) 131 Cal.App.4th 236, 247; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418-1419 [there is no due process violation if the Agency has made a good faith effort to provide notice to a parent whose whereabouts were unknown for most of the proceedings]; see also *Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 317  ["[I]n the case of persons missing or

11

unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."].)

At the hearing on his section 388 petition, it was R.H.'s burden to show the Agency's efforts to search for him were inadequate and, if so, it would be in Diego's best interests to return the case to the disposition phase.[4] (*Justice P., supra,* 123 Cal.App.4th at pp. 189-191.) We conclude the court properly found the Agency's search efforts for R.H. were reasonable. Before the disposition hearing, the mother told the Agency R.H. was the father and she believed he was in Tijuana. The Agency initiated a thorough search for R.H. on August 4, 2010, in the San Diego area—including searching records of local jails, police, the Department of Justice, the Registrar of Voters and the Department of Motor Vehicles—and completed the search on October 18, 2010, with no results. On October 20, 2012, a social worker contacted R.H.'s mother (the paternal grandmother), who said R.H. was incarcerated in Tijuana. The social worker then contacted La Mesa Penitenciaria in Tijuana to see if R.H. was there and was incorrectly informed that he was not.

In response to R.H.'s argument that the Agency should have used DIF to find R.H. before the disposition hearing, the trial court reasonably found R.H. had not "made a showing that even if DIF had been contacted [before disposition], that they would have provided information other than the paternal grandmother's home where [R.H.] lived from 2007 until his

---

4       In its oral ruling at the hearing, the court found that because the Agency's search efforts were reasonable, there was not a change in circumstances warranting relief under section 388. The court further found that "even if it were found that there has been a change in circumstance, that it would not be in the best interests of [Diego] to go back to the dispositional date."

12

incarceration in 2009, nor does it appear, and [R.H.] has not shown, that having contacted the . . . liaison office, that DIF would have been given different information than the Agency was given. [¶] So at that point in time, without the paternal grandmother or the family members having enough of a relationship with [R.H.] to give more information, and according to the grandmother they were estranged, having contacted the individual prison, or jails, and then contacted the . . . liaison [office], I don't know what else the Agency could have done."

The court added that "it would have been appropriate to ask or commission an official DIF parent search, but I am satisfied on these facts that DIF would not have been provided any additional information than the Agency had already garnered on their own from the various incarceration facilities and the [liaison] office in Tijuana."[5] The court found that although the situation was "tragic from [R.H.'s] perspective[,]" R.H. had "not established that it was unreasonable for the Agency to rely on the information provided by official governmental entities in the . . . country of Mexico, and the location of Tijuana." "[T]he information from the . . . liaison[] office is that there's absolutely no record of [R.H.'s] being incarcerated for the 2009 to 2012 period of time."

In short, the court reasonably found that because of faulty record keeping by the La Mesa Penitenciaria in Tijuana, the Agency would not have located R.H. even if it had contacted the grandmother, the La Mesa Penitenciaria, or DIF before the disposition hearing. We conclude the court properly found that the Agency's efforts to locate R.H. were reasonable.

---

5    According to minor's counsel at the section 388 and section 366.26 hearing, the social worker who contacted the La Mesa Penitenciaria in October of 2010 to inquire about R.H.'s incarceration also contacted jails in Tecate, Mexico, and was informed that R.H. was not incarcerated in them.

13

Even if we were to conclude that the Agency did not exercise due diligence in its predisposition searches for R.H., we would nonetheless conclude that the court properly denied the section 388 petition on the ground R.H. failed to meet his burden of establishing that granting the petition and returning the case to the disposition phase would be in Diego's best interests. (*Justice P., supra,* 123 Cal.App.4th at p. 188.) At the time of the hearing on the 388 petition, the court had terminated the mother's services and the focus of the proceedings had shifted to Diego's needs for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Diego was thriving in his foster home and his caregivers wanted to adopt him. Diego had been in their home for over two years and was a part of their family and everyone in the family loved him. He was five years old and had not seen R.H. since he was two years old. The social worker believed that Diego would have an extremely difficult time adjusting to people he no longer knew who did not speak the language he spoke and would "likely suffer a huge setback if he has to go to Mexico and be in a home and school that speaks a language that is completely foreign to him." The social worker opined that placing Diego with either R.H. or the paternal grandmother would likely be very traumatic for him and would not be in his best interests, and that any future benefit from a relationship with R.H. did not outweigh the benefits of adoption. The court was entitled to find the social worker's opinion credible and to give great weight to her assessment. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

We conclude the court reasonably found it would not be in Diego's best interests to trade his beneficial placement and prospective adoption for continuation of the dependency proceedings and placement with caregivers who spoke a language he did not understand and with whom he was not currently bonded. As this court noted in *Justice P.*: "It is not always

14

possible to litigate a dependency case with all parties present. The law recognizes this and requires only reasonable efforts to search for and notice missing parents. Where reasonable efforts have been made, a dependency case properly proceeds. If a missing parent later surfaces, it does not automatically follow that the best interests of the child will be promoted by going back to square one and relitigating the case. Children need stability and permanence in their lives, not protracted legal proceedings that prolong uncertainty for them. Further, the very nature of determining a child's best interests calls for a case-by-case analysis, not a mechanical rule." (*Justice P., supra,* 123 Cal.App.4th at p. 191.)

Finally, we conclude that to the extent the court and Agency erred by not providing R.H. earlier notice of the dependency proceedings, the error was not prejudicial. "Unless there is no attempt to serve notice [of dependency proceedings] on a parent . . . , errors in notice do not automatically require reversal but are subject to the harmless beyond a reasonable doubt standard of prejudice." (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.) Because R.H. was incarcerated and could not be located during most of the dependency proceedings, he could not have obtained custody of Diego and developed a parent-child relationship with him. Although R.H. knew the maternal grandmother was taking Diego back to California, he never asked for her address or telephone number. The social worker viewed R.H.'s failure to seek the maternal grandmother's contact information as abandonment of Diego. Because we cannot say R.H. would have obtained a different or more favorable result had he been located and provided notice of the proceedings before the jurisdiction/disposition hearing, any error in not giving him earlier notice was harmless beyond a reasonable doubt. The court did not abuse its discretion in denying R.H.'s section 388 petition.

## II. *Adoptability Finding*

We reject R.H.'s contention that there is insufficient evidence to support the court's finding that Diego is adoptable. "A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.' [Citation.] The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) The fact that a prospective adoptive parent has expressed interest in adopting a child is usually "evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.) "Since it is not even necessary that one prospective adoptive home be identified before a child may be found adoptable, a fortiori, [when a qualified prospective adoptive parent is willing to adopt] it is not necessary that backup families be identified." (*In re I.I.* (2008) 168 Cal.App.4th 857, 870.)

We review the juvenile court's finding of adoptability under the substantial evidence standard. "[W]e view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment." (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165; *In re B.D., supra*, 159 Cal.App.4th at p. 1232.) It is R.H.'s burden to establish that there is insufficient evidence to support the adoptability finding. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

16

Shortly before the section 366.26 hearing in this case, the Agency reported that Diego's foster family was committed to adopting him, their adoption home study was in progress, and it was expected the family would be approved within the next 30 to 60 days. In addition, the Agency reported, and the court found, that there were 65 families with approved adoption home studies that had requested a child matching Diego's characteristics. The evidence that Diego's foster family was willing to adopt him was itself sufficient to support the court's adoptability finding. (*In re I.I., supra,* 168 Cal.App.4th at p. 870.) The court properly found by clear and convincing evidence that it was likely Diego would be adopted.

### III. *Finding of Unfitness*

R.H. contends the court violated his right to due process by terminating his parental rights without a finding of parental unfitness. The Agency contends R.H. forfeited this assignment of error by failing to raise the issue in the trial court. We agree.

As this court explained in *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222 (*Dakota H.*),[6] "[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as 'waiver,' applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings." R.H. did not assert in the trial court that due process required the court to find he was unfit to parent Diego before terminating his parental rights. Had he done so, "the court could have considered [his] claim

---

[6]     The mother in *Dakota H.* contended the juvenile court violated her due process right to a continued relationship with her child by failing to make a new finding of parental unfitness when it terminated her parental rights. (*Dakota H., supra,* 132 Cal.App.4th at p. 221.) Although the *Dakota H.* court concluded the mother forfeited the right to claim that error on appeal by failing to raise the issue in the juvenile court, it nevertheless addressed the mother's due process argument on the merits and rejected it. (*Id.* at pp. 222-227.)

17

and, if it found [the] due process argument meritorious, determined and applied the appropriate legal standard. A party may not assert theories on appeal which were not raised in the trial court." (*Id.* at p. 222.)

Even if the forfeiture rule did not apply, we would reject R.H.'s contention that the court committed reversible error by failing to make a finding of unfitness. "A parent's interest in the companionship, care, custody and management of his or her children is a fundamental civil right." (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1210 (*P.A.*).) In *Santosky v. Kramer* (1982) 455 U.S. 745, the United States Supreme Court held that before a state severs that right, it must find parental unfitness by clear and convincing evidence. (*Id.* at pp. 747-748.) California's dependency system satisfies that requirement because by the time parental rights are terminated, the juvenile court has made multiple prior findings of unfitness.[7] (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254, 256.)

In *P.A.*, the Court of Appeal decided the juvenile court's failure to find a father was unfit as a parent did not preclude termination of parental rights. The *P.A.* court concluded the juvenile court had sufficiently found that return of the child to the father and mother would be detrimental to the child when it found at disposition hearing by " 'clear and convincing evidence that there exists a substantial danger to the children and there's no reasonable means to protect them without removal from *the parents'* custody.' " (*P.A., supra,* 155 Cal.App.4th at p. 1212.) The *P.A.* court concluded the juvenile court made a second finding of detriment

---

7    "California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to a parent would be detrimental to the child. (*P.A., supra,* 155 Cal.App.4th at p. 2111.) The finding of detriment is equivalent to a finding of unfitness. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423; *In re Dakota H., supra,* 132 Cal.App.4th at p. 224, fn. 3.)

18

when it denied the father reunification services because his whereabouts were unknown. (*Ibid.*)

Here, the court similarly found by clear and convincing evidence at the disposition hearing that there would be "a substantial danger to the physical health of the child . . . if the child were returned home, and there are no reasonable means by which the child's physical health can be prevented without removing the child from the physical custody of the child's *parent(s)* . . . ." (Italics added.) In the same order, the court entered a judgment of nonpaternity as to Robert and found that reasonable search efforts had been made to locate and notify R.H., which amounted to a finding that R.H.'s whereabouts were unknown. As the *P.A.* court reasoned in viewing the denial of reunification services to a father based on his whereabouts being unknown as a detriment finding, evidence that a parent's whereabouts are unknown and the parent has been absent from the child's life is sufficient to support a finding that return of the child to the parent would be detrimental to the child. (*P.A., supra,* 155 Cal.App.4th at p. 1212.)

At the combined section 388 and section 366.26 hearing, the court again effectively found that placing Diego in R.H.'s custody would be detrimental to Diego.[8] In denying R.H.'s section 388 petition, the court found that "it would not be in the best interests of [Diego] to go back to the dispositional date. Again [R.H.] had very little, if any, contact with his child in the time he was incarcerated in May of 2009 until the present. The [paternal grandmother's] home

---

8   As noted, R.H. did not actually request custody of Diego but rather requested that the paternal grandmother be given custody of Diego. However, R.H. indicated that he lived with the paternal grandmother, stating, in his interview with a social worker that "[t]hey all live together." The paternal grandmother did not request custody.

19

evaluation appears to be positive, but he has not established a relationship. They do not share a common language at this point, so I do not find it would be in the child's best interests."

At the section 366.26 phase of the hearing, the court found that termination of the mother and R.H.'s parental rights "would not be detrimental to Diego . . . ." The court stated: "Specifically, the court finds that neither mother nor [R.H.] have maintained regular or consistent contact or visits with Diego. And further, it would not be in Diego's `best interests to promote or facilitate either a mother-child or father-child relationship. [¶] The court does find that whatever benefit may have been conferred upon Diego by the time he has spent with each and both of his parents is greatly outweighed by the need for stability and placement, which can only be achieved through adoptive placement." These findings essentially constitute a determination as to both parents that placing Diego in parental custody would be detrimental to him. Although the court's findings were phrased in terms of Diego's best interests, " '[t]he two standards [best interest and detriment] are basically two sides of the same coin. What is in the best interests of the child is essentially the same as that which is not detrimental to the child.' " (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 829.)

The court's detriment finding as to R.H. is supported by the Agency's reports and other evidence supporting the court's determination that granting R.H.'s section 388 petition would not be in Diego's best interests. In considering whether the record supports the court's detriment finding, we draw every reasonable inference and resolve all conflicts in favor of that finding. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) The record indicates R.H. had a history of abusing drugs and alcohol. As discussed above, the Agency reported that R.H. was incarcerated for robbery when his whereabouts were unknown and he made no effort to search

20

for Diego after he was released. The social worker opined that placing Diego with either R.H. or the paternal grandmother would be traumatic for him, and the benefits of adoption outweighed any benefit he might realize from developing a relationship with R.H. R.H. had not requested that *he* be given custody of Diego, and the paternal grandmother had not personally requested custody. Diego was five years old and had not seen R.H. since he was two years old. In the social worker's view, R.H. abandoned Diego after the maternal grandmother took him back to California, and it would now be extremely difficult for Diego to adjust to people he no longer knew who did not speak the same language he spoke. The order terminating R.H.'s parental rights is sufficiently supported by evidence that awarding custody of Diego to R.H. would be detrimental to Diego.

## DISPOSITION

The order denying R.H.'s section 388 petition is affirmed. The order terminating parental rights and selecting adoption as the permanent plan for Diego is affirmed.


NARES, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.

21